NORTHWESTERN NATIONAL BANK OF MINNEAPOLIS, MINNESOTA, a Corporation, Appellant, v. N. T. ROSENQUIST, Respondent.

(224 N. W. 909.)

Opinion filed April 6, 1929.

*Pierce, Tenneson, Cupler & Stambaugh (Koon, Whelan, & Hempstead,* of counsel), for appellant.

*Burdick, Shaft, & Burk,* for respondent.

BIRDZELL, J. This is an appeal from an order overruling a motion of the plaintiff for a judgment notwithstanding the verdict or for a new trial. The plaintiff sued on a contract of guaranty and the defendant answered admitting the execution of a contract purporting to be a guaranty but alleged that it was not delivered for the purpose of having it take effect as such. It was further alleged that there was no consideration for such guaranty, that the indebtedness which purports to have been thus guaranteed was an indebtedness of the First State Bank of Epping, North Dakota, to the plaintiff, to secure which indebtedness the defendant had delivered and the plaintiff taken bills receivable of the Epping bank upon which large sums applicable to the indebtedness had been collected and that the collateral lien had been illegally foreclosed and the collateral otherwise dissipated.

For a counterclaim the defendant alleged that on the 15th day of September, 1923, he entered into an agreement with the plaintiff bank that in consideration of the Epping bank and the defendant delivering to the plaintiff collateral notes to the face value of $9,459.95, to be held by the plaintiff as security, the plaintiff would upon receipt thereof place to the credit of the Epping bank the sum of $5,000 and that in pursuance of the agreement and in reliance upon representations made by the plaintiff's agent the defendant, as an officer and director of the Epping bank, delivered to the plaintiff, $5,000 face value, of selected securities, bills receivable of the Epping bank, and $2,000 of selected securities belonging to the defendant, but that the plaintiff failed to give the Epping bank credit for $5,000 but nevertheless had

kept and retained the securities to the damage of the defendant to the extent of $2,000.

The basis of a second counterclaim, as alleged, is that by reason of the failure of the plaintiff to extend the credit contracted for, as alleged in the first counterclaim, the Epping bank was unable to pay its demands and was forced to close solely on account of the failure of the plaintiff to carry out its agreement; that upon the closing of the bank its assets depreciated to the extent that the bank became insolvent, thus rendering the stock of the defendant worthless and subjecting him to a liability for an assessment of $8,000. Upon the trial a verdict was returned for a dismissal of the plaintiff's action and for the defendant on the counterclaims for the sum of $10,658.33 without interest. There were special findings by the jury as follows: Q. If you find plaintiff agreed to advance a $5,000 credit to the First State Bank of Epping on September 20, 1923, or September 21, 1923, was there any consideration for such promise? A. Yes. Q. If you find there was consideration for such promise, what was that consideration? A. Assets consisting of bills receivable and real estate. Q. If you find that plaintiff agreed to advance five thousand dollars credit on September 21st or September 20th, 1923, who made that promise for the plaintiff? A. Northwestern National Bank, Minneapolis, Minnesota, by William N. Johnson.

A brief statement of facts will conduce to an understanding of the questions presented on this appeal. The plaintiff, Northwestern National Bank of Minneapolis, was city correspondent of the First State Bank of Epping, North Dakota. The latter bank was run by the defendant and his wife, the two owning practically all of the capital stock. From time to time loans were obtained by the Epping bank from the Northwestern National Bank secured by collateral under a pledge agreement dated August 31, 1915. In December, 1920, while notes owing by the Epping bank to the Northwestern bank were maturing or past due one Smith, a collector for the Northwestern bank called upon the defendant at Epping and upon his solicitation the defendant and his wife executed the contract of guaranty upon which this action is brought. The Epping bank remained indebted to the Minneapolis bank until it was closed in September, 1923. At that time its indebtedness to the plaintiff was approximately $11,000, for

which collateral to the amount of more than $30,000 had been pledged. This indebtedness was evidenced partly by promissory notes, dated at Minneapolis, Minnesota, and containing a collateral pledge agreement authorizing a sale of the collateral, and partly by overdrafts. There is a conflict in the evidence as to the purpose for which the guaranty was executed. Rosenquist testified, in substance, that it was represented to him that the guaranty was wanted as a matter of form in order that the files of the bank would be complete and regular; that there was to be no liability; and that the Minneapolis bank would not come to him for payment but would rely upon the collateral. On September 20, 1923, one Johnson, a collector for the Northwestern bank, called at the Epping bank, checked over its bills receivable and took from the bank at that time about $7,000 of its bills receivable as collateral to its existing indebtedness. A large portion of this amount represented renewals of paper already held by the Northwestern bank as collateral. At that time there was an overdraft of about $3,700.

It is urged upon this appeal that the evidence is insufficient to support the verdict in the defendant's favor upon the guaranty, it being the contention that Smith, the agent of the Northwestern National Bank, had no authority to enter into an agreement with Rosenquist whereby his liability upon the guaranty should be other than that which it purports to be. There is testimony tending to show that the document was not delivered to take effect as a guaranty. It is elementary that before any ordinary written instrument is binding upon a party whose obligation it purports to carry it must be shown to have been delivered for the purpose of taking effect. Foot, S. & Co. v. Skeffington, 52 N. D. 307, 202 N. W. 642; Security Nat. Bank v. Andrews, 53 N. D. 328, 205 N. W. 732. This is even true of negotiable instruments. Negotiable Instruments Law, §. 16 (Laws 1899, chap. 113); Comp. Laws 1913, § 6901. If the contract in the instant case was desired by the bank for the purpose of having its records appear regular and as such to satisfy either its own regulations or those of the examining authorities and was taken with the distinct understanding that the defendant was not to be held liable, the instrument was clearly not delivered to take effect as a guaranty. In view of the evidence this question is settled by the verdict. This was not commercial paper; hence, the rule relied upon by the appellant to the effect

that an officer or agent of a bank has no authority to bind the bank by a representation that a person placing his name upon commercial paper will not be held bound (See First State Bank v. Forsyth, 41 Mont. 249, 28 L.R.A.(N.S.) 501, 108 Pac. 914; First Nat. Bank v. Davidson, 48 N. D. 944, 188 N. W. 194; 1 Morse, Banks & Bkg. 6th ed. § 167) has no application. Neither is this a case where one may be held to his ostensible liability to prevent a fraud on depositors or other creditors. Vallely v. Devaney, 49 N. D. 1107, 194 N. W. 903; Engen v. Matthys, 50 N. D. 487, 196 N. W. 550. We are of the opinion that the verdict is conclusive in so far as the jury found against the plaintiff on its cause of action.

This brings us to a consideration of the counterclaims upon which the defendant has judgment. The theory of these counterclaims is that the defendant has sustained losses by reason of the failure of the plaintiff to perform an alleged agreement entered into in September, 1923, to extend an additional credit to the Epping bank, or through reliance upon representations made by the plaintiff's agent that such credit would be extended. It is claimed that the plaintiff lost a specific piece of real estate of the value of $2,000 and sustained a further damage due to assessment liability upon and shrinkage in value of his bank stock through the failure of the bank, which in turn was caused wholly by the plaintiff's failure to extend the credit alleged to have been agreed upon. There is no evidence in the record that the plaintiff's agent who called at the Epping bank on the 20th of September, 1923, and secured additional collateral had any authority to bind the plaintiff bank by any contract to furnish additional credit. Such evidence as there is upon the question negatives the authority. Neither is there any showing that the plaintiff had held out its agent Johnson as possessing any such authority. Johnson is not shown to have been either an officer or director of the plaintiff bank, nor to have been employed in any capacity in which he might bind the bank by a contract for a loan. So far as this record shows he was employed to check up collateral already held, to secure renewals of it and to obtain such additional collateral as he could for the already existing indebtedness; also, to ascertain, as far as possible, the general condition of the bank of which his employer was a creditor in a substantial amount. There is no basis for assuming that his authority was in any

way misrepresented to Rosenquist or that Rosenquist acted upon any such misrepresentations. While the latter testifies to an arrangement made on the 20th of September, whereby the Epping bank was to be given an additional credit in the shape of an overdraft up to $5,000, including the existing overdraft, his testimony on cross-examination and his letter of the following day to the plaintiff bank indicate that he was not relying upon any absolute promise of Johnson that such credit would be extended. With reference to the arrangement at the time the additional collateral was obtained, Rosenquist testified: Q. And the items of that collateral given at that time are those indicated in Exhibit 11? A. Yes. . . . Q. And he told you that he wanted those to protect the existing overdraft, didn't he? A. Yes, to protect the existing overdrafts and what additional credit we wanted. Q. Was there anything said about additional credit? A. Yes, sir. Q. Did Johnson tell you that you could exceed the existing overdraft in the future? A. He certainly did. Q. When did he tell you that? A. Right there in the bank. Q. When? A. September 20, 1923. Q. What did you call him up on the 21st for? A. *Because he was very indefinite.* Q. So you got hold of him the next day? A. Yes. Q. And you called him by telephone? A. I did. Q. At Watford City? A. Yes, sir. Q. And you asked him at that time to recommend further overdraft? A. Yes. Q. You told him at that time you would give him deed to the Ray property? A. I did not tell him so, but he demanded and I said I would give it if he would wire in—Q. And you gave it to him? A. Yes. Q. Then you wrote in to the Northwestern National Bank on September 21st with reference to the Ray transaction? A. I do not remember. The witness then identified Exhibit H, a letter written by him to the plaintiff bank on September 21, 1923, as follows:

"Herewith I send you note for $4,100 to take up one for like amount due the 18th. Your Mr. Johnson called upon us yesterday and we went over the condition here so that you will have knowledge of our proposition in a few days.

"To-day the First National Bank of Williston reported some drafts being refused, but I trust with Mr. Johnson reporting to you by wire, that you will protect us until we can have grain checks to send to cover overdraft.

"I'm sending you herewith deed to a piece of property we have at Ray. This really belongs to Mrs. Rosenquist and myself, but in order to help out this situation we are pledging this for the protection of our bank."

To this letter the plaintiff replied as follows:

"I have yours of the 21st with your note for $4,100 offered as renewal of your obligation of like amount which matured with us on the 18th which we canceled, also statement showing the results.

"We are also in receipt of warranty deed running to blank offered to us as collateral to protect us should the occasion require. I do not have the least idea of the value of this property and do not want you to consider that we are accepting this as collateral to protect the overdrafts. You are overdrawn this morning $1,175.76. The reason for returning the checks drawn in favor of the First National Bank, Williston, was that it looked as though they had prevailed upon you to reduce your loan with them. You wrote sometime ago they were anxious to collect and made things very unpleasant for you.

"From now on we expect this overdraft to be reduced rather than increased and hope you will have no trouble in doing so."

The correspondence passing between Rosenquist and the plaintiff bank the preceding month shows that the plaintiff bank was objecting to overdrafts of the Epping bank exceeding $3,000 and desired that credit in this form should be treated as temporary and the amount so extended reduced. In our opinion the evidence fails to establish any agreement for a definite extension of the credit by overdraft to the amount of $5,000, as claimed by the defendant. We are also of the opinion that there is no substantial evidence in the record of any misrepresentation by the plaintiff that such credit would be extended if the deed to the Ray property were delivered. However, it does appear that this deed was sent by the plaintiff in reliance upon the promise of Johnson that he would recommend an additional credit and in the hope that by reason of its being furnished some further indulgence might be secured for the Epping bank; and it does not appear that such anticipations were realized. Upon the failure of the Epping bank a few days later, this deed was not returned. It was retained by the plaintiff and almost two years thereafter disposed of and the proceeds credited upon the indebtedness of the Epping bank. It appears that

by a letter, dated July 29, 1925, Rosenquist recognized that this property was being held as collateral and expressly assented to a contemplated disposition saying he was willing that the property be sold for $1,000 cash upon condition that the rent money which he had collected would be allowed as an additional settlement of the equity which he held in the property. In a statement thereafter rendered to the receiver of the Epping bank, showing the disposition of the collateral held by the plaintiff, credit is given for $1,000 received on account of this item. Rosenquist, having recognized that the plaintiff held this property as collateral security and having consented that it be disposed of for cash, is precluded from now recovering the value of the property from the plaintiff who had in reliance upon his assent disposed of the property and given the agreed credit. It may well be added that the record shows that when the plaintiff bank received the deed to the Ray property it was notified by the defendant of the existence of his equity. That equity was not cut off in favor of the plaintiff by any subsequent transaction and it can still be asserted unless the property has passed to a purchaser without notice, and if it has passed to a purchaser without notice this record indicates that no conveyance was made until after Rosenquist's consent was obtained. "He who consents to an act is not wronged by it." Comp. Laws 1913, § 7249.

The gravamen of the second counterclaim is contained in the third paragraph:

"That on said 15th day of September, 1923 the said Epping bank was short of ready funds with which to meet its regular and usual demands, but that said bank was solvent under the laws of the State of North Dakota, and that said bank at said time enjoyed the confidence of its depositors and clients, and that there was an unusually good crop in said community about to be marketed, and that said deposit of $5,000 if made by the plaintiff in accordance with said agreement would have carried said bank through to the receipt of collections by the marketing of said crop, but that when the plaintiff failed to credit said bank with said five thousand dollars in accordance with said agreement, said bank was unable on September 26th to pay its usual and ordinary demands in the usual and ordinary way, and by reason thereof, the defendant was forced to close said bank on said day, but that said bank was solvent on said day under the laws of the state of

North Dakota, and that the closing of said bank was caused entirely and solely by the act of the plaintiff in not carrying out its said agreement of September 15th, 1923."

Following this the defendant alleges a depreciation in the assets of the Epping bank due to its closing, his consequent liability as a stockholder and his personal loss incident thereto. It will be noted, by reference to the special findings of the jury, that any contract made between the plaintiff bank and the Epping bank or Rosenquist for further credit on the strength of the added collateral was made by Johnson. As previously indicated in this opinion, there is no evidence that Johnson had any authority to bind the plaintiff by such an agreement and the testimony of Rosenquist, considered as a whole, indicates that no definite agreement to this effect was in fact reached between him and Johnson. It therefore follows that the judgment entered on the verdict in favor of the defendant is erroneous and it must be reversed.

Judgment reversed and action dismissed.

BURKE, Ch. J., and BURR, CHRISTIANSON, and NUESSLE, JJ., concur.